J. S34035/20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INT. OF: A.M.B.F., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: H.B., FATHER | : | No. 520 MDA 2020 |

Appeal from the Decree Entered March 5, 2020,
in the Court of Common Pleas of Lancaster County
Orphans' Court Division at No. 2019-02096

BEFORE: PANELLA, P.J., BENDER, P.J.E. AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED: AUGUST 31, 2020**

H.B. ("Father") appeals from the decree dated March 4, 2020, and entered March 5, 2020,[1] in the Orphans' Court of Lancaster County, granting the petition of the Lancaster County Children and Youth Social Service Agency ("the Agency") and involuntarily terminating his parental rights to his minor

---

[1] While dated March 4, 2020, the decree was not entered for purposes of Pa.R.C.P. 236(b) until March 5, 2020, upon the filing of decree and docketing of notice. **See Frazier v. City of Philadelphia**, 735 A.2d 113, 115 (Pa. 1999) (holding that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given"); **see also** Pa.R.A.P. 108(a) (entry of an order is designated as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)".).

female child, A.M.B.F. ("Child"), born in June 2018, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[2]  After careful review, we affirm.

The orphans' court summarized the relevant facts and procedural history of this case as follows:

> [Child] was born [in June 2018].  The Agency filed a Petition for Temporary Custody of the Child [shortly after her birth,] alleging [Child] is a dependent child pursuant to 42 Pa.C.S.[A.] 6302, in that [Child]:
>
>> is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his/her physical, mental, or emotional health, or morals; a determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian, or custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk.
>
> A Shelter Care Order was issued on June 21, 2018, which granted temporary custody of [Child] to the Agency.

---

[2] Father did not appeal the order changing Child's permanency goal to adoption.  On October 24, 2019, the court terminated the parental rights of Child's mother, X.F. ("Mother").  (**See** Decree, 10/24/19, at 1.)  Mother has not appealed the termination.  (**See** orphans' court opinion, 4/21/20 at 5.)  On January 23, 2020, the court terminated the rights of E.P., Child's presumptive father, pursuant to his voluntary relinquishment of his parental rights.  (**See** Decree, 1/23/20, at 1.)  Presumptive father did not appeal the termination of his parental rights.

An Order of Adjudication and Disposition-Child Dependent was issued by the Honorable Thomas B. Sponaugle of this court on September 13, 2018, which found [Child] to be a dependent child. Father stipulated that there was sufficient evidence to support the finding of dependency and he agreed to the objectives on the initial child's permanency plan. That plan, as approved by the court, established a primary permanency goal of reunification and a concurrent permanency goal of adoption for [Child].

A permanency review hearing was held on November 29, 2018. In the resulting order, the court found that Father's compliance with [Child]'s permanency plan was minimal and that the progress Father had made thus far toward alleviating the circumstances which necessitated the original placement was also minimal.

The next permanency review hearing was held on April 18, 2019. The court again found that Father's plan compliance was minimal and his progress toward alleviating the circumstances which necessitated the original placement also remained minimal. Notably, Father failed to attend this permanency review hearing.

The subsequent permanency review hearing was held before a master and resulted in a Recommendation-Permanency Review Order which was approved by the court on September 20, 2019. Father was found to have no compliance with the permanency plan as he has been incarcerated at the Lancaster County Prison since May 10, 2019. It was noted that Father had been sentenced on September 13, 2019, and that he was expected to remain incarcerated for six more months. Father was also found to have made no progress in alleviating the circumstances that necessitated the placement of [Child].

Orphans' court opinion, 4/21/20 at 1-5 (footnotes omitted).

On August 30, 2019, the Agency filed a petition for involuntary termination of parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b). The court conducted a termination hearing on January 9, 2020. The Agency presented the testimony of caseworker Jessica Landman. Father testified on his own behalf. Gina Carnes, Esq., the attorney-guardian *ad litem* ("GAL") appointed to represent Child, was also present.[3] Attorney Carnes recommended that Father's parental rights be terminated. (Notes of testimony, 1/9/20 at 59.) On March 5, 2020, the orphans' court entered a decree involuntarily terminating Father's parental rights to Child pursuant to Sections 2511(a)(1), (2), and (b). (*See* Decree, 3/5/20 at 1.) On March 23,

---

[3] *See In re Adoption of L.B.M.*, 161 A.3d 172, 175, 180 (Pa. 2017) (plurality) (stating that, pursuant to 23 Pa.C.S.A. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome); *see also In re T.S.*,192 A.3d 1080, 1089-1090, 1092-1093 (Pa. 2018) (finding the preferred outcome of a child who is too young or non-communicative unascertainable in holding a child's statutory right to counsel not waivable and reaffirming the ability of an attorney/guardian *ad litem* to serve a dual role and represent a child's non-conflicting best interests and legal interests). We note, however, our recent opinion in *In re: Adoption of K.M.G.*, 219 A.3d 662 (Pa.Super. 2019) (*en banc*), *granting appeal in part*, 221 A.3d 649 (Pa. 2019) (holding that this court has authority only to raise *sua sponte* the issue of whether the trial court appointed any counsel for the child, and not the authority to delve into the quality of the representation). Attorney Carnes stated, ". . . due to her age, she was not able to articulate [her preferences]." (Notes of testimony, 1/9/20 at 53.)

2020, Father filed a timely notice of appeal. On March 25, 2020, Father filed

a concise statement of errors complained of on appeal.[4]

Father raises the following issues for our review:

> 1. Whether the [c]ourt correctly found that [the Agency] had met its burden of proving with clear and convincing evidence that Father, who was incarcerated for a majority of the relevant time period, failed or refused to perform his parental duties and would not be in a position to do so in the reasonable future[?]
>
> 2. Whether the Agency provided sufficient evidence that the termination of parental rights was in [Child's] best interest[?]

Father's brief at 6 (answers omitted).

In matters involving involuntary termination of parental rights, our

standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. [A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously

---

[4] Although Father failed to file contemporaneously his notice of appeal and statement of errors complained of on appeal, he filed the statement of errors two days later, on March 25, 2020. Accordingly, we decline to dismiss Father's appeal on this basis. *See In re: K.T.E.L.*, 983 A.2d 745 (Pa.Super. 2009) (failure to file a Rule 1925(b) statement is considered a defective notice of appeal and will not be dismissed since failure to file the statement is a violation of a procedural rule and not an order of court).

> emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and internal quotation marks omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined "clear and convincing evidence" as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (citation and quotation marks omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), and (b), which provide as follows:

### § 2511.  Grounds for involuntary termination

**(a)** **General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)    The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2)    The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

**(b)** **Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the

> conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), and (b). We need only agree with the juvenile court as to any one subsection of Section 2511(a), in addition to Section 2511(b), to affirm a decree terminating parental rights. *In re M.M.*, 106 A.3d 114, 117 (Pa.Super. 2014).

Instantly, we analyze the orphans' court's decision to terminate Father's parental rights to Child under Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (citations and internal quotation marks omitted).

"The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *Id.* "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely

or disingenuous." ***In re A.L.D.***, 797 A.2d 326, 340 (Pa.Super. 2002) (internal quotation marks and citations omitted).

With respect to incarcerated parents, our supreme court has held that "incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing essential parental care, control, or subsistence." ***In re Adoption of S.P.***, 47 A.3d 817, 830 (Pa. 2012) (citation and internal quotation marks omitted). "The length of the remaining confinement can be considered as highly relevant to whether the conditions and causes of the incapacity . . . cannot[,] or will not[,] be remedied by the parent, sufficient to provide grounds for termination pursuant to 23 Pa.C.S.[A.] § 2511(a)(2)." ***Id.*** (internal quotation marks omitted).The efforts made by the parent to care for a child before incarceration, as well as efforts to maintain a relationship with a child while incarcerated, are both relevant. ***See In re Z.P.***, 994 A.2d 1108, 1126 (Pa.Super. 2010) (terminating parental rights of incarcerated father after finding "Father's overall parenting history revealed no genuine capacity to undertake his parental responsibilities"); ***see also In re E.A.P.***, 944 A.2d 79, 83 (Pa.Super. 2008).

Father contends that the court erred in terminating his parental rights pursuant to Section 2511(a)(2) because he requested, obtained, and participated in visits with his daughter while incarcerated, and the visits went well and he acted appropriately. (***See*** Father's brief at 5.) Father argues further that he engaged in drug and alcohol treatment in prison in 2019, and

was awaiting enrollment in prison mental health counseling and parenting groups. (*Id.* at 5-6.)

Upon review, we find that there was clear and convincing evidence to support the juvenile court's termination of Father's parental rights to Child, pursuant to Section 2511(a)(2). The record establishes that "incapacity" under Section 2511(a)(2) exists given that Father has demonstrated a repeated and continual inability to fully satisfy his permanency plan objectives.

As noted, the Agency became involved in this matter in June 2018, when Child showed signs of opioid withdrawal at birth. (Notes of testimony, 11/3/19 at 3-5.) The Agency had a long history with Mother, and Father was on parole for a criminal history that involved drug and theft charges. (*Id.* at 5.) Jessica Landman, the Agency caseworker assigned to this matter, testified that Father's child permanency plan included the following objectives for reunification with Child: (1) attend mental health treatment; (2) attend drug and alcohol treatment and remain drug and alcohol free; (3) remain crime free; (4) remain domestic violence free; (5) learn and use good parenting skills; (6) obtain financial stability to provide for himself and Child; (6) maintain a home free of hazards to himself and his child; and (7) maintain an ongoing commitment to Child. (*Id.* at 5-6.)

Ms. Landman's testimony during the termination hearing revealed that Father has failed to satisfy his objectives. Father did not complete his mental

health goal. (*Id.* at 7.) Father did complete a psychological and parenting capacity evaluation in December 2018, while incarcerated, and was released shortly thereafter, but did not participate in weekly therapy. (*Id.* at 6-7.) Father briefly participated in treatment at T.W. Ponessa in March 2019, but stopped attending; he claimed he was planning to attend treatment at another clinic but was arrested prior to doing so, in May 2019. (*Id.* at 6-7.)

Father did not complete his drug and alcohol goal. (*Id.* at 8.) He participated in a 30-day rehabilitation program and was successfully discharged in February 2019. (*Id.*) However, he did not follow through with the recommendation to complete weekly outpatient treatment, and was again arrested in May 2019. (*Id.*) Father informed Ms. Landman that he had participated in drug and alcohol treatment in Lancaster County Prison; however, he failed to provide the requested documentation so that the Agency could determine whether the treatment plan was acceptable. (*Id.* at 8, 18.)

Father did not complete his goal to remain crime-free. (*Id.* at 8.) Father was incarcerated in July 2018 for theft, and released in February 2019 after completing a 30-day inpatient program. (*Id.* at 8-9.) Father failed to attend scheduled probation appointments and a bench warrant was issued; Father has been incarcerated since May 2019 as a result. (*Id.* at 9.) In September 2019, Father was sentenced to ten months of incarceration. (*Id.*)

Father did not complete his goal with respect to domestic violence. (*Id.* at 9.) Father signed a release for a referral, and a referral was completed in

March 2019. (*Id.*). However, he was arrested and incarcerated prior to receiving treatment. (*Id.* at 10.) Similarly, Father did not participate in a parenting program. (*Id.*) Additionally, although Father was approved for work release, he did not have employment lined up for his release from prison.[5] (*Id.*) Nor did Father have stable housing.[6] (*Id.*)

Ms. Landman testified Father attended some visitation with Child in October 2018, while incarcerated. (*Id.* at 16). After his release in February 2019, Father did not attend visitation with Child until March 2019, when he attended two visits with Child. (*Id.* at 10, 14.) Father did not visit with Child in April 2019, and stated that he had "gotten mixed up" with Mother and "did not have his priorities straight, basically, so he wasn't showing up." (*Id.* at 11.) Father has been having visits on a biweekly basis at the prison as of September 2019. (*Id.* at 11, 17.)

Father testified on his own behalf that he had attended drug and alcohol group meetings in prison, and that, upon his release in February 2019, he completed a 30-day inpatient treatment program at Cove Forge. (*Id.* at 24-25, 27-28.) At Cove Forge, Father was prescribed Vivitrol. (*Id.* at 27-28.)

---

[5] Father had previously received income from social security disability due to chronic depression and mild bipolar disorder, but at some time prior to the hearing, his benefits ceased. (*Id.* at 37-38.)

[6] Father indicated that he planned to live with his mother upon his release from prison; however, as she had Section 8 housing, Father could not be added to the lease, and the Agency could not consider that arrangement "stable housing." (*Id.* at 10.)

Upon his release from Cove Forge in March 2019, Father attended three appointments at T.W. Ponessa. (*Id.* at 24-25, 39-42.) Father claimed that, because he did not like the care providers at T.W. Ponessa, he switched "a few days later" to treatment at Nuestra Clinica. (*Id.* at 42.) Father attended Nuestra Clinica "four or five times" before he was again arrested in May 2019. (*Id.*) Father claimed to have been seeing "a lady" for mental health counseling once a month, and that he was attempting to apply for groups, but had not received a call back as of the date of the hearing. (*Id.* at 27.) Additionally, Father claimed that he had not provided documentation of his treatment because his caseworker had not asked for it. (*Id.* at 42.)

Father testified that he had stopped meeting with his parole officer because she had threatened to arrest him, and that he had only returned positive drug tests for opioids due to Vivitrol shots. (*Id.* at 29-30.) Father claimed that due to the parole officer's suspicion of his repeated positive screens, he switched medically assisted treatment from Vivitrol to Suboxone. (*Id.* at 44-45.). Father also stated that he stopped visiting with Child due to his fear of arrest on the bench warrant issued for his failure to report to his parole officer. (*Id.* at 32-34, 43-45.) Father denied committing domestic violence against Mother, but stated that he had not completed domestic violence treatment because of the long waiting lists in prison. (*Id.* at 45-51.) Father expects to be released in March 2020. (*Id.* at 45.)

With respect to Section 2511(a)(2), the orphans' court observed

> The record clearly establishes that there is no realistic prospect that Father will resolve the several aspects of his ongoing incapacity to parent at any time in the foreseeable future. Even had Father been poised to be released from prison on the day of the termination hearing, many deficits and impediments to his parental capacity would have remained. Father had no realistic prospect for housing which would be adequate for [Child] and him. Father had no realistic prospect that he would have income sufficient to support [Child] and him. Given Father's prolonged evasion of his probation officer (and the likely reason for that evasion), questions about Father's capacity to maintain freedom from his prior drug addiction would remain. Father still has hills to climb to address his mental health, domestic violence, and parenting objectives which were established in [Child's] permanency plan to which Father agreed at the adjudication/disposition hearing on September 13, 2018 – now more than a year and a half ago.

Orphans' court opinion, 4/21/20 at 19-20.

Based on the foregoing, we agree with the orphans' court that there exists clear and convincing evidence of record to terminate Father's parental rights to Child pursuant to Section 2511(a)(2). *See In re Adoption of C.D.R.*, 111 A.3d at 1216.

Next, we consider Father's contention that the termination of his parental rights was improper under Section 2511(b) because there was not sufficient evidence to support the contention that termination was in Child's best interests. (*See* Father's brief at 16-17.) In support of this contention, Father argues that there was no testimony from a caseworker or other witness that the termination of Father's rights would be in Child's best interests. (*Id.*

at 17.) Father contends the court gave insufficient weight to the fact that the Agency presented evidence the visits with Child are appropriate and that Father engages with Child. (**Id.**)

With regard to Section 2511(b), our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include [i]ntangibles such as love, comfort, security, and stability. . . . [T]his Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. However, as discussed below, evaluation of a child's bonds is not always an easy task.

**In re T.S.M.**, 71 A.3d at 267 (internal case citations omitted).

"[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." **In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa.Super. 2010) (citations omitted). Additionally, when evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." **In re Z.P.**, 994 A.2d 1108, 1121 (Pa.Super. 2010) (citations omitted). This court has long recognized

> [w]hile a parent's emotional bond with his or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent . . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (citations and internal quotation marks omitted).

Upon review, we find that the record supports the orphans' court's determination that the termination of Father's parental rights was clearly in the best interests of Child, pursuant to Section 2511(b). At the termination hearing, Father's own testimony did not provide evidence of a bond. He testified that seeing Child makes him happy because she is a part of him. (Notes of testimony, 1/9/20, at 34.) However, Father admitted that Child has begun to act "not as close" to him as she had at the early visits, although she will warm to him gradually towards the end of the visit. (*Id.* at 34-35.) When asked whether Child called him anything, Father stated that Child "hardly speaks." (*Id.* at 35.) Father presented no additional testimony or evidence to show any parental bond between him and Child.

Ms. Landman testified that, while visits with Father go well "as far as" Father is appropriate with Child and engages with her, for the last month of visits, Child is "very apprehensive" with Father and cries when he attempts to

hold her. (*Id.* at 20.) It is not until halfway through visits that Child will calm down enough to interact with Father. (*Id.*).

Child was less than two years old at the time of the hearing, and had never lived with Father. As noted, above, no concrete evidence of a bond between Child and Father was presented. Accordingly, it was reasonable for the court to conclude that there was no healthy bond between Child and Father. *See*, *e.g.*, *J.M.*, 991 A.2d at 324.

Ms. Landman testified that Child resides in a foster home with her half-sister. (*Id.* at 11.) Child is developmentally on target. (*Id.* at 11-12.) Child is very close with her half-sister. (*Id.* at 13.) Child looks to her foster mother for anything she needs, including emotional support. (*Id.*) Child calls foster mother "Momma." (*Id.*). Foster mother ensures Child receives medical treatment for "frequent medical issues," which include frequent ear infections, tubes in her ears, and blood in her stool. (*Id.* at 12.)

Attorney Carnes noted that Child was very comfortable, bonded, content, and well cared for by foster mother. (*Id.* at 52.) Child is very happy, interactive, and bonded, especially with her sister. (*Id.*) Ultimately, Attorney Carnes recommended that it was in Child's best interests for Father's rights to be terminated. (*Id.* at 60.)

The orphans' court observed:

> [Child] deserves a nurturing, loving, and stable home. [Child] enjoys a home possessing these characteristics with her resource family, which included her half-sister with whom she is closely

> bonded. The record established that [Child]'s resource parent has been attentive to [Child's] special health needs and that those needs have substantially resolved. Most recently, [Child] has been apprehensive when brought to the prison for visits with Father. To the extent that there is a bond between [Child] and Father, it is not a healthy bond which is beneficial to [Child]. It is in [Child's] best interest that Father's parental rights be terminated.

Orphans' court opinion, 4/21/20 at 21.

Our standard of review requires us to accept the orphans' court's findings of fact and credibility determinations where, as here, they are supported by the record. *See In re T.S.M.*, 71 A.3d at 267. Accordingly, Father's contention that termination of his parental rights was improper under Section 2511(b) must fail.

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights to Child pursuant to Section 2511(a)(2) and (b). Accordingly, we affirm the orphans' court's March 5, 2020 decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/31/2020